IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA, ex rel.
FOX RX, INC.,

    Plaintiff

    v.

OMNICARE, INC., and
NEIGHBORCARE, INC.,
    Defendants.

Civil No. 1:11-CV-0962

~~FILED UNDER SEAL~~

## SECOND AMENDED COMPLAINT

The United States of America, by and through its qui tam Relator,Fox Rx, Inc. (Fox, Plaintiff or Relator) brings this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, et seq., againstOmnicare, Inc.,and its subsidiary, NeighborCare, Inc. (hereinafter, except where indicated, the companies together are referred to as Omnicare), to recover all damages, penalties, and other remedies provided by the False Claims Acts on behalf of the United Statesand the Relator, and for theirSecond Amended Complaint allege:

EXHIBIT

1

1

## Introduction

Omnicare, Inc., is a large company providing pharmacy services to long-term care facilities (LTCFs), including nursing homes. Many LTCF residents receive prescription drugs through the Medicare Part D and Medicaid insurance programs.In July 2005, Omnicare, Inc., purchased another long-term care pharmacy chain, NeighborCare, Inc., which is now a wholly-owned subsidiary of Omnicare, Inc.; the acquisition increased Omnicare's size by one-third.

Omnicare's LTCF business consists of two interrelated functions: It contracts with LTCFs to provide "consulting pharmacy" services including, as described in Paragraph 45, reviews of patients' drug regimens required by the federal government. Omnicare also serves as a dispensing pharmacy to LTCFs, filling prescriptions, submitting claims and receiving reimbursement from both governmental programs such as Medicaid, and private companies providing insurance plans under Medicare Part D.

In November 2009, Omnicare paid $98 million to settle allegations that it solicited kickbacks from pharmaceutical manufacturers and paid kickbacks to nursing homes. According to the Department of Justice's press release:

The settlement with Omnicare – the nation's largest pharmacy that specializes in providing drugs to nursing home patients – resolves allegations that the company solicited or paid a variety of kickbacks. The company allegedly solicited and received kickbacks from a pharmaceutical manufacturer, Johnson & Johnson (J&J), in exchange for agreeing to recommend that physicians prescribe Risperdal, a J&J antipsychotic drug, to nursing home patients.  * * * The government further alleged that Omnicare regularly paid kickbacks to nursing homes by providing consultant pharmacist services at rates below the company's cost and below the fair market value of such services in order to induce the homes to refer their patients to Omnicare for pharmacy services. The government also alleged that Omnicare solicited, and IVAX paid, $8 million in kickbacks in exchange for Omnicare's agreement to purchase $50 million in drugs from IVAX.

Department of Justice, Press Release, "Nation's Largest Nursing Home Pharmacy

and Drug Manufacturer to Pay $112 Million to Settle False Claims Act Cases"

(Nov. 3, 2009; available at http://www.justice.gov/opa/pr/2009/-

November/09-civ-1186.html).

Since the commencement of the Part D program in 2006, Omnicare has

routinely overcharged Fox and other sponsors of Medicare Part D plans (PDPs)

through four fraudulent schemes:

- First, Omnicare fills and submits claims for atypical antipsychotic drugs

   that are medically unnecessary and even contraindicated because the

   patients who receive them suffer from dementia; in doing so, Omnicare

3

fails to fulfill its obligations to oversee the use of antipsychotic

pharmaceuticals in the vulnerable elderly population it serves;

- Second, Omnicare engages in "prescription splitting" – providing a smaller

  quantity of drug than required for the entire prescribed period,

  necessitating more frequent dispensing and a greater total dispensing fee

  charge;

- Third, Omnicare submits claims for antipsychotic pharmaceuticals without

  complying with prior authorization requirements in PDP sponsors'

  government-approved formularies; and

- Fourth, Omnicare waives or fails to collect copayments from beneficiaries

  to induce them to purchase or receive prescription drugs.

## I.  Parties

1. Plaintiff and Relator Fox Rx, Inc., is a Delaware Corporation, and is the

   parent corporation of Fox Insurance, Inc. (Fox), a Delaware corporation

   that was, from 2006 to 2010, engaged in the business of sponsoring PDPs.

2. Plaintiff United States of America, acting through the Department of

   Health and Human Services (HHS), and its Centers for Medicare and

   Medicaid Services (CMS) administers the Health Insurance Program for

4

the Aged and Disabled established by Title XVIII of the Social Security Act,

42 U.S.C. §§ 1395, et seq. (Medicare), and Grants to States for Medical

Assistance Programs pursuant to Title XIX of the Social Security Act, 42

U.S.C. §§ 1396 et seq. (Medicaid).

3.  Defendant Omnicare, Inc. (Omnicare), is a Delaware corporation with

offices in Covington, Kentucky. Together with its wholly-owned

subsidiary, NeighborCare, Inc., Omnicare is the nation's largest provider

of pharmacy services to nursing homes and other LTCFs. Through

contracts with these facilities, it serves as a consulting pharmacist and

dispenses drugs to approximately 1.4 million long-term care residents in

47 states, including Georgia, and the District of Columbia.

## II. Jurisdiction and Venue

4.  Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and

3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

5.  The Court may exercise personal jurisdiction over the Defendants, and

venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C.

§ 1391 because the acts proscribed by 31 U.S.C. §§ 3729 et seq.,and

complained of herein took place in part in this district and the Defendant

transacted business in this district.

6. For the 2009 and 2010 plan year, Fox Insurance, Inc., contracted with

ProCare Rx (ProCare), of Duluth, Georgia in this District to serve as its

Pharmacy Benefit Manager (PBM). During those two plan years, Omnicare

sent each of its claims to ProCare, which processed and forwarded them to

Fox Insurance for payment and reporting of the PDEs to CMS. Omnicare's

transactions with ProCare support jurisdiction and venue in this District.

7. In addition, Omnicare, Inc., owns and operates at least two pharmacies in

this District that have engaged in the conduct described in this Complaint:

Medical Arts Health Care, Inc., located at 594 Sigman Road, N.E., Conyers,

Georgia; and Georgia Pharmacy Co., LLC, located at 4901 Old National

Highway, Atlanta, Georgia.

8. Pursuant to 31 U.S.C. § 3730(b)(2), the Plaintiffprepared and served with

the originalComplaint on the Attorney General of the United States, and

the United States Attorney for the District of Northern District of Georgia a

statement of all material evidence and information currently in

itspossession and of which it is the original source. In addition, the

Plaintiff and Relator prepared and served with its First Amended

Complaint on those officials a supplement containing a statement of material evidence and information currently in its possession and of which it is the original source, relating to the allegations added in the First Amended Complaint. These disclosure statements are supported by material evidence known to the Plaintiff and Relator at the time of filing establishing the existence of Defendant's false claims. Because the statements include attorney-client communications and work product of Plaintiff's and Relator's attorneys, and were submitted to those Federal officials in their capacity as potential co-counsel in the litigation, the Plaintiff and Relator understandsthese disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

### III.   Legal Background

### The False Claims Act

9. The False Claims Act provides, in pertinent part:

  (a) Liability for certain acts. —

    (1) In general. — Subject to paragraph (2), any person who —

        (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D)has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be_delivered,_ less than all of that_ money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G)knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions. — For purposes of this section —

(1)the terms "knowing" and "knowingly" —

8

(A)mean that a person, with respect to information—

(i)has actual knowledge of the information;

(ii)acts in deliberate ignorance of the truth or falsity of the information; or

(iii)acts in reckless disregard of the truth or falsity of the information; and

(B)require no proof of specific intent to defraud;

(2)the term "claim"—

(A)means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i)is presented to an officer, employee, or agent of the United States; or

(ii)is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)provides or has provided any portion of the money or property requested or demanded; or

(II)will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B)does not include requests or demands for money or property that the Government has paid to an individual as

compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3)the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4)the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729(a), (b).

10. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996,28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**The Medicare Antikickback Statute**

11. The Social Security Act provides, in pertinent part:

(b) Illegal remunerations

\* \* \*

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

10

* * *
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000, or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

12. Compliance with the Medicare Antikickback Statute is necessary for reimbursement under Medicare, and claims made in violation of the law are actionable civilly under the False Claims Act. *United States* ex rel. *McNutt v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005).

*Overview of Medicare Part D*

13. Medicare is a federally funded and administered health insurance program for certain groups of persons, primarily the elderly and the disabled. HHS administers the Medicare program through its sub-agency, the Centers for Medicare and Medicaid Services (CMS).

14. Medicare Part D is a voluntary prescription drug benefit program for Medicare enrollees that became effective on January 1, 2006. 42 U.S.C. 1395w-101et seq.

15. Medicare Part D coverage is offered through private companies, known as Part D sponsors, which contract with CMS to administer prescription drug plans (PDPs).

16. CMS gives each Part D sponsor advance monthly payments consisting of the PDP's direct subsidy per enrollee (which is based on a standardized bid made by the Part D sponsor), estimated reinsurance subsidies for catastrophic coverage, and estimated low-income subsidies. 42 C.F.R. §§ 423.315, 423.320.

17. Beneficiaries' coverage varies by their cost of drug usage over the course of a plan year:

   a. <u>Deductible</u>: As with most insurance plans, beneficiaries do not receive any benefits under Medicare Part D until their out-of-pocket costs for prescription drugs meets a modest deductible amount ($310 for 2010).

   b. <u>Initial Coverage</u>: Once a beneficiary meets his or her deductible, they receive prescription drug benefits up to an annual cap ($2830 for 2010).

   c. <u>Coverage Gap (the "Doughnut Hole")</u>: After the beneficiary reaches the cap of the initial coverage, they fall into a coverage gap until

their total out-of-pocket costs reach a threshold for catastrophic coverage ($4550 for 2010).

d. <u>Catastrophic Coverage</u>: After the beneficiary meets the threshold amount, they are again entitled to prescription drug benefits under a reinsurance scheme in which the CMS pays 80% of drug costs, the Part D sponsor pays 15% and the beneficiary pays 5%.

18. Throughout the payment year, each time a Medicare beneficiary has a prescription filled under Part D, the sponsor receives a claim from the pharmacy and notifies CMS of the event, including the cost the sponsor has incurred. At the end of the payment year, CMS reconciles the advance payments paid to each Part D sponsor with the actual costs the sponsor has incurred.

19. If CMS underpaid the sponsor for low-income subsidies or reinsurance costs, CMS makes up the difference. If CMS overpaid the sponsor for these costs, it recoups the overpayment from the Part D sponsor.

20. After CMS reconciles a plan's low-income subsidy and reinsurance costs, it then determines risk-sharing amounts owed by the plan to CMS or by CMS to the plan related to the plan's direct subsidy bid. Risk-sharing amounts involve calculations based on whether and to what degree a

plan's allowable costs per beneficiary exceeded or fell below a target amount for the plan by certain threshold percentages (commonly called the Part D risk corridor). 42 C.F.R. § 423.336.

21. Although CMS and beneficiaries together pay a monthly insurance premium to the Part D sponsor (this is called a "capitated" rate), there are several circumstances under whichprescriptions dispensed to an individual beneficiary may cause CMS to make additional payments to (or collect monies from) a Part D sponsor:

   a. A beneficiary with a low income may be subsidized by CMS, causing the government to pay costs that otherwise the beneficiary would bear, such as copayments and, within the coverage gap, out-of-pocket prescription costs.

   b. When a beneficiary is entitled to catastrophic coverage, the government pays 80% of the beneficiary's drug costs through reinsurance paid to the PDP sponsor. In essence, CMS reimburses the plan for prescriptions for such beneficiaries on a nearly fee-for-service basis.

*Medicare's Requirements of Participants in Part D*

22. Medicare Part D requires all participants in the program – PDP sponsors, PBMs, and pharmacies – to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1).

23. Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(3)(v). Services performed by or delegated to such "first-tier" and "downstream" entities much meet the standards required of the Part D sponsor. *Id.*, §§ 423.505(i)(3(v), 423.505(i)(4)(iv).

*Sponsors, Pharmacy Benefit Managers, and Pharmacies Under Part D*

24. Part D sponsors enter into contracts with pharmacies (including LTC pharmacies, such as Omnicare) to provide prescription drugs to their plan members.

25. Part D sponsors also frequently contract with a PBM to administer their prescription drug programs. PBMs work with Part D sponsors to develop and implement a prescription drug formulary, and provide automated

processing services for Part D sponsors to "adjudicate" claims submitted

by pharmacies on a real-time basis.

26. From 2006 to 2010, Fox entered into contracts with Pharmacy Benefit

Managers to assist in operating its Part D plans.

27. Omnicare has entered into subcontracts with the majority of Medicare Part

D sponsors, including Fox, either directly, or through PBMs.

*Part D Limitations on Drugs*

28. Not all drugs are eligible for reimbursement under Medicare Part D: only

those drugs prescribed for a medically-accepted indication are covered. 42

U.S.C. § 1395w-102(e)(1); 42 C.F.R. § 423.100; *Medicare Prescription Drug*

*Benefit Manual*, ch. 6, § 10.6.

29. Medically-accepted conditions under Part D include uses approved by the

Food and Drug Administration, and those supported by certain

compendia (privately-published books or electronic databases that provide

information on prescription drugs to healthcare providers and

pharmacists). These compendia include the *American Hospital Formulary*

*Service Drug Information*, the *United States Pharmacopeia Drug Information* or

its successor publications, and Thomson's *DrugDEX Information System*. 42

U.S.C. §§ 1395w-102(e)(4)(A)(ii), 1396r-8(g)(1)(B)(i).

*Part D Claims*

30. When a long-term care pharmacy such as Omnicare dispenses drugs to a Medicare Part D enrollee, it submits a claim electronically to the enrollee's Part D sponsor (often via a PBM) comprised of several pieces of information, including the ingredient cost (the cost of the drug itself), a dispensing fee, and any sales or similar taxes paid, less any payments received from the enrollee and any rebates received from the drug's manufacturer or distributor.

31. The Part D sponsor then uses the information provided by the LTC pharmacy, reformats it, and submits it to CMS as a Prescription Drug Event (PDE). CMS uses the PDE information at the end of the payment year when it reconciles its advance payments to the Part D sponsor with the costs the sponsor has incurred throughout the year, as described in Paragraph 19.

32. The LTC pharmacy certifies to the PDP sponsor that the information contained in the PDE is accurate, complete, and truthful. Based on this representation, the PDP sponsor provides a similar certification to CMS.

**IV.      Omnicare's Fraudulent Schemes**

33. Since 2006, Omnicare has routinely overcharged Medicare Part D in
violation of the False Claims Act by billing for medically unnecessary and
contraindicated antipsychotic drugs, the artificial shortening of the days'
supply of medication to increase the number and frequency of dispensing
fees ("prescription splitting"), failing to obtain prior authorization before
dispensing antipsychotic drugs under circumstances requiring such
approval, and waiving or failing to collect copayments as a means of
inducing beneficiaries to purchase or receive prescription drugs.

*Omnicare Has Submitted Claims for Medically Unnecessary and Danger*

*Atypical Antipsychotic Drugs*

Background on Antipsychotic Abuse in LTCFs

34. Many LTCF residents suffer from illnesses such as dementia whose
behavioral challenges require well-trained and adequate numbers of LTCF
staff. Because of the difficulty and cost of dealing with such patients, LTCF
staffs are often tempted to misuse prescription drugs' behavioral effects to
make residents more compliant.

35. HHS rules specifically prohibit, however, the use of these medically
unnecessary "chemical restraints":

18

The resident has the right to be free from any physical or chemical restraints imposed for purposes of discipline or convenience, and not required to treat the resident's medical symptoms.

42 C.F.R. § 483.13(a).

36. One class of drugs frequently misused as a chemical restraint is atypical antipsychotics. (The term "atypical" refers to the now-questioned belief that unlike "typical," or first-generation antipsychotic drugs, these drugs did not cause side effects dealing with the extrapyramidal system in the brain.) These second-generation drugs are approved to treat the psychotic symptoms of mental illness, but they also affect the behavior of patients without mental illness, making such persons easier to manage in an LTCF setting.

37. The FDA has approved eight atypical antipsychotic drugs to treat various mental disorders, including:

   a. Aripiprazole (sold by Bristol-Myers Squibb under the brand name Abilify);

   b. Clozapine (sold by Novartis under the brand name Clozaril);

   c. Olanzapine (sold by Lilly under the brand name Zyprexa);

   d. Olanzapine/Fluoxetine (sold by Lilly under the brand name Symbyax);

    e. Paliperidone (sold by Janssen under the brand name Invega);

    f. Quetiapine (sold by AstraZeneca under the brand name Seroquel);

    g. Risperidone (sold by Johnson & Johnson under the brand name

       Risperdal); and

    h. Ziprasidone (sold by Pfizer under the brand name Geodon).

38. The FDA's approval of these drugs is limited to certain specific mental health conditions (including schizophrenia and certain conditions associated with that illness, schizoaffective disorder, and the acute manic and mixed episodes associated with bipolar disorders; Risperdal is also approved for use in adolescents for certain symptoms of autism disorder).

39. Each of the atypical antipsychotic drugs has the potential for side effects affecting patient health. These iatrogenic (or treatment-caused) conditions are sometimes serious, and can include cardiovascular risks such as stroke, parkinsonism, seizures, and diabetes, among others.

40. In addition, each of the atypical antipsychotic drugs increases the risk of death in patients with dementia. In 2005, the FDA issued a public health advisory after concluding that the use of atypical antipsychotics by patients with dementia posed a 60% to 70% greater risk of death:

> Of a total of seventeen placebo controlled trials performed with
> olanzapine (Zyprexa), aripiprazole (Abilify), risperidone (Risperdal),
> or quetiapine (Seroquel) in elderly demented patients with
> behavioral disorders, fifteen showed numerical increases in
> mortality in the drug-treated group compared to the placebo-treated
> patients. These studies enrolled a total of 5106 patients, and several
> analyses have demonstrated an approximately 1.6-1.7 fold increase
> in mortality in these studies.

FDA Public Health Advisory, "Deaths With Antipsychotics in Elderly

Patients With Behavioral Disturbances," (Apr. 11, 2005) (last accessed on

Jul. 10, 2011 at http://www.fda.gov/Drugs/DrugSafety/-

PostmarketDrugSafetyInformationforPatientsandProviders/DrugSafetyInf

ormationforHeathcareProfessionals/PublicHealthAdvisories/ucm053171.

htm).

41. In 2005, the FDA also imposed a "black box" warning on the prescribing

information of all drugs in the atypical antipsychotic class, similar to the

following warning for Risperdal (the branded version of Risperidone):

---

**WARNING: INCREASED MORTALITY IN ELDERLY PATIENTS
WITH DEMENTIA-RELATED PSYCHOSIS**
*See full prescribing information for complete boxed warning.*
**Elderly patients with dementia-related psychosis treated with
antipsychotic drugs are at an increased risk of death.RISPERDAL® is
not approved for use in patients with dementia-relatedpsychosis. (5.1)**

---

The drug compendia identified by the Social Security Act as authoritative

sourcesdo not support the use of the antipsychotics identified in Paragraph

37 in patients with dementia, as required for a use not approved by the

FDA to be a "medically accepted indication" and, therefore, reimburseable

under Medicare Part D. 42 U.S.C. §§ 1395w-102(e)(4)(A)(ii), 1396r-

8(g)(1)(B)(i).

## Federal Regulation of Antipsychotics in LTCFs

42. Because of these grave risks to human health and safety, federal law

imposes special restrictions on antipsychotic use in treating long-term care

facility patients. Medicare regulations for LTCFs provide:

(l) *Unnecessary drugs* — (1) *General.*
Each resident's drug regimen must befree from unnecessary drugs.
An unnecessarydrug is any drug when used:
    (i) In excessive dose (including duplicate drug therapy); or
    (ii) For excessive duration; or
    (iii) Without adequate monitoring; or
    (iv) Without adequate indications for its use; or
    (v) In the presence of adverse consequences which indicate the
    dose should be reduced or discontinued; or
    (vi) Any combinations of the reasons above.

(2) *Antipsychotic Drugs.* Based on a comprehensive assessment of a
resident, the facility must ensure that —
    (i) Residents who have not used antipsychotic drugs are not
    given these drugs unless antipsychotic drug therapy is
    necessary to treat a specific condition as diagnosed and
    documented in the clinical record; and
    (ii) Residents who use antipsychotic drugs receive gradual
    dose reductions, and behavioral interventions, unless
    clinically contraindicated, in an effort to discontinue these
    drugs.

42 C.F.R. § 483.25(l).

43. Under Part D, CMS has identified six "protected classes" of pharmaceuticals: immunosuppressants (for prophylaxis of organ transplant rejection), antipsychotics, antidepressants, anticonvulsants, antineoplastics, and antiretroviral drugs. For Parts D members "currently taking" these drugs, PDP sponsors are barred from employing managed care techniques such as step therapy and alternative treatments. By removing the PDP sponsor's ability and incentive to monitor these drugs' utilization, Part D's protected classes thus pose a special danger for fraud and abuse.

44. Although antipsychotics are a protected class of drugs, this designation does not broaden the scope of their use under Medicare Part D; antipsychotics – like all other drugs – are only reimburseable when used for a medically accepted indication. 42 U.S.C. § 1395w-102(e)(1); 42 C.F.R. § 423.100; *Medicare Prescription Drug Benefit Manual*, ch. 6, § 10.6.

## Omnicare's Role in Antipsychotic Abuse

45. In order to ensure that LTCF residents receive appropriate medications, CMS requires LTCFs to retain pharmacists as employees or contractors to

perform monthly reviews of patients' drug regimens. 42 C.F.R. § 483.60(b), (c).

46. Omnicare markets itself as a provider of consulting pharmacy services and has entered into contracts with hundreds of nursing homes to meet CMS's requirement for consultant pharmacy services.

47. Omnicare provides consulting pharmacist services (as described in Paragraph 45) to manyof the LTCFs at which it provides prescription drugs.

48. Despite the limitations that federal law places on the use on drugs generally, and antipsychotics specifically, Omnicare has submitted thousands of claims for reimbursement of atypical antipsychotics that are ineligible for reimbursement under Medicare because the patients to whom they are dispensed do not suffer from a condition for which the FDA has approved the drugs' or for which the compendia identified in Paragraph29 support the use of the drugs.

49. In addition, the use of atypical antipsychotics in the claims described in Paragraph48is specifically contraindicated by the FDA because the patients suffer from dementia and are at an increased risk of death from the use of the drugs.

24

50. The diagnostic information provided to Fox for risk-adjustment provides the evidence that the beneficiaries described in Paragraph XX lacked a medically approved indication for the antipsychotic drug they received.

51. Medicare Part D beneficiaries with histories of serious illness are more likely than those with healthier backgrounds to incur large prescription drug costs. To ensure that Part D plans are adequately compensated for insuring such higher-utilization beneficiaries, CMS employs a risk-adjustment model called RxHCC (this acronym stands for "prescription hierarchical condition category").

52. The RxHCCsystem consists of a series of code numbers corresponding to groups of related conditions. CMS reviews each Part D beneficiary's Medicare claims for hospital and physician services (under Medicare Parts A and B, respectively) to determine the diagnoses those healthcare providers have made about the beneficiary, and assigns to each beneficiaryRxHCC codes that summarize their medical history.

53. CMS updates each beneficiaries' RxHCC profile periodically.

54. In the cases described in Paragraph 48, Omnicare dispensed atypical antipsychotics and submitted claims for reimbursement even though the

beneficiaries' RxHCC diagnosis history reflected no medically approved indication before or during the period of the beneficiary's use of the drug.

55. Because Omnicare not only dispenses drugs but serves as consulting pharmacist to LTCFs, Omnicare has both knowledge of patients' medical conditions and an obligation to ensure that antipsychotic drugs are not misused as chemical restraints.

56. In its role as a consulting pharmacist, Omnicare has access to LTCF residents' medical records and is required to review them monthly. Accordingly, Omnicare knows that the patients described in Paragraph 48 lacked a medically accepted indication for the atypical antipsychotics the company dispensed and for which it submitted claims for reimbursement.

57. Omnicare failed to meet its obligations to oversee the use of antipsychotic pharmaceuticals in patients at LTCFs it serves, as required by federal regulations governing LCTF review of patients' drug regimens and antipsychotic use.

58. The harm from Omnicare's participation in antipsychotic misuse is evidenced by several measurements:

a. Fox members who were LTCF patients suffering from dementia and served by Omnicare in 2009 were 65% more likely to die than similar patients served by other LTCF pharmacies (10.00% vs. 6.06%);

b. Very few of Omnicare's patients' antipsychotic prescriptions – approximately 1/10th the rate of other LTC pharmacy chains – are written by mental health specialists trained to diagnose the mental health conditions that are medically accepted indications for antipsychotics; and

c. In numerous cases, Omnicare patients who improperly received atypical antipsychotics developed serious side effects – including cerebrovascular accidents (strokes), diabetes, parkinsonism, and seizure – necessitating the use of additional drugs to treat these iatrogenic (treatment-caused) conditions.

59. As described in Paragraph 43, antipsychotics are a "protected class" of drugs under Part D. Omnicare has exploited this vulnerability in Part D, knowing that PDP sponsors such as Fox are prevented from questioning antipsychotic prescriptions for patients "currently taking" them, and has acquiesced in LTCFs' misuse of antipsychotics to chemically restrain their patients.

60. On information and belief, Omnicare has engaged in similar misconduct with respect to other Part D plan sponsors since January 1, 2006.

61. Attachment A to this Complaint is a spreadsheet that includes the particular facts and circumstances for a sample of 20 Fox Part D enrollees for whom Omnicare, Inc., provided antipsychotic pharmaceuticals despite the absence of any diagnostic history of psychosis and despite the presence of dementia, as shown in their RxHCC categories (with identifying information redacted).

62. Attachment B to this Complaint is a spreadsheet that includes the particular facts and circumstances for a sample of 20 similar Fox Part D enrollees for whom NeighborCare, Inc., provided antipsychotic pharmaceuticals.

63. In numerous cases, Omnicare patients suffering from dementia who received antipsychotics in the absence of any supporting diagnosis experienced dangerous side effects and were subsequently placed on additional drugs to treat these iatrogenic conditions. Attached to this Complaint are examples showing such treatment for conditions such as stroke (Attachment C1), diabetes (Attachment C2), parkinsonism (Attachment C3), and seizure (Attachment C4).

64. The Plaintiff and Relator possess, and will provide under an appropriate protective order, the PDE data for each and every prescription as described in Paragraph 48for all Fox Part D enrollees from 2006 to 2010.

*Omnicare Engages in Prescription Splitting to Increase Dispensing Fees*

65. A prescription for a drug includes its dosage (including its amount and frequency) and the length of time over which the drug should be taken (the prescribed period).

66. Occasionally, pharmacists must partially fill a prescription – or provide fewer doses of the drug than are necessary for the entire prescribed period – for legitimate reasons (e.g., due to supply constraints). These partial fills are reflected in the days supply of medication and reported to the PDP sponsor, who in turn reports this information to CMS through a field in the PDE.

67. Since January 1, 2006, however, in thousands of cases Omnicare has artificially shortened the days' supply, a practice known as prescription splitting.  Approximately 4% of prescriptions handled by Omnicareconsist of either more than one claim for the same drug in the same month, or more than five claims for the same drug in a year for which the days' supply dispensed was less than the period prescribed.  For other long-term

care pharmacies used by Fox enrollees, the percentage of such claims averages between 0.0% and 1.0%.

68. On information and belief, Omnicare has similarly split prescriptions billed to other Part D plan sponsors since January 1, 2006.

69. The effect of Omnicare's prescription splitting is to increase the frequency – and therefore the number – dispensing fees, resulting in Omnicare charging and receiving a greater payment than if the company had dispensed the prescription as written.

70. Attachment D to this Complaint is a spreadsheet that includes the particular facts and circumstances for a sample of 20 Fox Part D enrollees for whom Omnicare, Inc.,split prescriptions, thereby increasing its dispensing fees.

71. Attachment E to this Complaint is a spreadsheet that includes the particular facts and circumstances for a sample of 20 similar Fox Part D enrollees for whom NeighborCare, Inc., split prescriptions.

72. The Plaintiff and Relator possess, and will provide under an appropriate protective order, the PDE data for each and every such prescription for all Fox Part D enrollees from 2006 to 2010.

*Omnicare Circumvents Prior Authorization Requirements*

30

## Background on Prescription Drug Plan Formularies

73. A drug plan's formulary is the list of pharmaceuticals the plan will provide, and includes patient costs and other restrictions which are intended to improve efficiency and reduce the cost of drug utilization.

74. Part D plan sponsors submit their formularies to CMS and must receive the agency's approval of the formularies' terms before the commencement of a Part D plan year and providing services to plan members.

75. Part D plan sponsors communicate (either directly, or indirectly through a PBM) the formulary and its requirements to pharmacies.

    For each of the plan years from 2006 to 2010, Fox communicated its formulary to Omnicare through Fox's PBM.

## Prior Authorization Requirements and Omnicare's Violations

76. "Prior authorization" refers to a requirement in a Part D plan's prescription drug formulary for a health care provider or beneficiary to contact the Part D plan sponsor and obtain approval before dispensing certain pharmaceuticals. This requirement is typically imposed for pharmaceuticals that are subject to abuse or for which alternative and less costly drugs or treatments are available.

77. At all times relevant to this Complaint, Fox's CMS-approved formularies imposed a prior authorization requirement for antipsychotic drugs for patients whose treatment fell outside the protected class definition, described in Paragraph 43.

78. Under Fox's formularies' requirements, providers such as Omnicare were required to obtain prior authorization from Fox before dispensing antipsychotics to patients who were new to an antipsychotic, and to demonstrate the medical necessity of prescribing an antipsychotic.

79. If an antipsychotic were prescribed to control the behavior of an LTCF resident, and not to treat a mental illness for which the drug was indicated, Fox would have refused to approve the use of an antipsychotic.

80. In over five thousand cases in 2009 and 2010 involving patients lacking a history of mental illness but suffering from dementia, Omnicare, Inc., and NeighborCare, Inc., either failed to seek prior authorization from Fox before dispensing and submitting claims for antipsychotic drugs, or sought prior authorization and were denied approval.

81. On information and belief, Omnicare has similarly failed to seek prior authorization as required by other Part D plan sponsors since January 1, 2006.

82. Because Omnicare received the formularies of PDP sponsors (including Fox), Omnicare knew of the prior authorization requirement; Omnicare's knowledge is corroborated by Omnicare's compliance with those rules in the case of other drugs, including drugs in protected classes other than antipsychotics.

83. Attachment F to this Complaint is a spreadsheet that includes the particular facts and circumstances for a sample of 20 Fox Part D enrollees for whom Omnicare and NeighborCare submitted and received payment for antipsychotic drugs but where the company either failed to seek prior authorization or sought it and was denied approval. In each case, the patient lacked a history of mental illness but suffered from dementia (a condition for which the use of antipsychotics is contraindicated, as described in Paragraphs 40 and 41).

84. The Plaintiff and Relator possess, and will provide under an appropriate protective order, the PDE data for each and every such prescription for all Fox Part D enrollees from 2006 to 2010.

*Omnicare Waives Copayments Without Justification*

85. Copayments are small amounts paid by Part D plan members for prescription drugs.In many cases, copayments for less expensive generic drugs are smaller than those for branded drugs.

86. Although individual copayment amounts are small, they are a critical component of cost containment in Medicare Part D, because they ensure that Part D beneficiaries have an incentive to monitor claims for drugs made on their behalf and to request less expensive drugs.

87. The amounts and circumstances under which copayments are charged are set by Part D plans' formularies which, as described in Paragraphs 73 through 75, are submitted to and approved by CMS prior to each plan year and communicated to pharmacies.

88. Copayments called for in formularies may be waived under certain limited circumstances, typically for patients who receive low-income subsidy payments and "dual-eligibles" (persons receiving benefits under both Medicare Part D and Medicaid).

89. However, a copayment waived in order to induce a federal healthcare program beneficiary to purchase or receive a prescription drug constitutes indirect remuneration to the beneficiary, in violation of the Medicaid Antikickback Statute, 42 U.S.C. § 1320a-7b(b).

90. At all times relevant to this Complaint, Fox's CMS-approved formularies required Part D members to pay copayments for certain prescription drugs.

91. In over three thousand cases in 2009 and 2010 involving patients who were not eligible to have their copayment waived, Omnicare and NeighborCare failed to collect copayments required under the relevant formulary.

92. Attachment G to this Complaint is a spreadsheet that includes the particular facts and circumstances of a sample of 20 Fox Part D enrollees for whom Omnicare and NeighborCare was required to, but did not obtain a copayment from the beneficiary.

The Plaintiff and Relator possesses, and will provide under an appropriate protective order, the PDE data for each and every such prescription for all Fox Part D enrollees from 2006 to 2010.

*Omnicare's Conduct Directly Impacted the U.S. Treasury*

93. Although Omnicare's conduct alleged in the preceding Paragraphs occurred in the context of a capitated insurance program, many of the company's false claims directly affected the United States Treasury.

94. Because most Part D enrollees who reside in LTCFs do so because they suffer from poor health, the overwhelming majority of such enrollees each year reach the annual catastrophic coverage trigger (for 2011, $4,050.00), after which the federal government reinsures the plan on an individual enrollee basis against 80% of further prescription drug costs.

95. Consequently, although many Part D enrollees' drug costs are covered by the capitated (per enrollee) subsidy, the majority of long-term care patients enrolled in Part D have the bulk of their claims individually reimbursed by the federal government through individual catastrophic coverage reinsurance, or through low-income cost-sharing payments.

96. For enrollees who have reached the level of catastrophic reinsurance, Omnicare caused each and every of the previously alleged false or fraudulent costs to be submitted by Fox for reimbursement, and Omnicare ultimately received payment.

## COUNT I – ANTIPSYCHOTIC FRAUD

### FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.

97. Plaintiff and Relator repeats each and every allegation of Paragraphs 1 through 33, 34 through 64, and 93 through 96 of this Complaint with the same force and effect as if set forth herein.

98. As a result of the foregoing conduct, Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

99. The claims relevant to this Count include all claims for reimbursement of atypical antipsychotic drugs submitted by Defendants to Part D plan sponsors from 2006 to the present, for which the beneficiary lacked a medically accepted indication and suffered from dementia.

100. Defendants submitted the claims to Part D plan sponsors including Fox knowing that those private entities were agents for the federal government, that the prescription drug claims would be submitted by the Part D plan sponsors as Prescription Drug Events (PDE) to CMS, and that in many cases, the federal government would base its payments to Part D plan sponsors on those PDEs.

101.    Defendants'claims were false because the beneficiaries did not have a medically accepted indication for the use of an antipsychotic.

102.    Defendantshad knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because in its role as consulting pharmacy it had actual and constructive knowledge of the medical records of the beneficiaries, reflecting the absence of a medically accepted indication, and because as a consulting pharmacy, Defendants were obligated under federal regulations to oversee the drug regimens of the beneficiaries.

## COUNT II – ANTIPSYCHOTIC FRAUD

## FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.

103.    Plaintiffand Relatorsrepeat each and every allegation of Paragraphs 1 through 33, 34 through 64, and 93 through 96of this Complaint with the same force and effect as if set forth herein.

104.    As a result of the foregoing conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

105.     The false record or statement relevant to this Count include all

records or statements relating to the dispensing of atypical antipsychotic

drugs submitted by Defendants to Part D plan sponsors from 2006 to the

present, for which the beneficiary lacked a medically accepted indication

and suffered from dementia.

106.     Defendants submitted the records or statements to Part D plan

sponsors including Fox knowing that those private entities were agents for

the federal government, that the Part D plan sponsors would rely upon the

truthfulness of these records or statements in submitting Prescription Drug

Events (PDE) to CMS, and that in many cases, the federal government

would base its payments to Part D plan sponsors on those PDEs.

107.     Defendants' records or statements were false because the

beneficiaries did not have a medically accepted indication for the use of an

antipsychotic.

108.     Defendants had knowledge (as defined by the False Claims Act, 31

U.S.C. § 3729(b)(1)(A)) of the records' or statements' falsity because in its

role as consulting pharmacy it had actual and constructive knowledge of

the medical records of the beneficiaries, reflecting the absence of a

medically accepted indication, and because as consulting pharmacies, Defendants were obligated under federal regulations to oversee the drug regimens of the beneficiaries.

109.    The falsity of the records or statements was material to CMS's decision to accept the PDEs both for consideration in determining the compensation to be paid to the Part D plan sponsors and for reimbursement in cases of low-income subsidized beneficiaries and beneficiaries qualifying for catastrophic coverage.

## COUNT III – PRESCRIPTION SPLITTING FRAUD

## FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.

110.    Plaintiff and Relator repeats each and every allegation of Paragraphs 1 through 33, 65 through 72, and 93 through 96 of this Complaint with the same force and effect as if set forth herein.

111.    As a result of the foregoing conduct, Defendant knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

112.     The claims relevant to this Count include all claims for reimbursement of drugs submitted to Part D plan sponsors from 2006 to the present, after the initial dispensing event, in which Defendants split prescriptions without justification into more than one dispensing event and charged more than one dispensing fee.

113.     Defendants submitted the claims to Part D plan sponsors including Fox knowing that those private entities were agents for the federal government, that the prescription drug claims would be submitted by the Part D plan sponsors as Prescription Drug Events (PDE) to CMS, and that in many cases, the federal government would base its payments to Part D plan sponsors on those PDEs.

114.     Defendants' claims were false because dispensing events subsequent to the first one were medically unnecessary and not the most economical means of providing prescription drugs to the beneficiary.

115.     Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity.

## COUNT IV – PRESCRIPTION SPLITTING FRAUD
## FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.

116.    Plaintiff and Relator repeats each and every allegation of Paragraphs 1 through 33, 65 through 72, and 93 through 96of this Complaint with the same force and effect as if set forth herein.

117.    As a result of the foregoing conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

118.    The records or statements relevant to this Count include all records or statements relating to the dispensing of drugs submitted to Part D plan sponsors from 2006 to the present, after the initial dispensing event, in which Defendants split prescriptions without justification into more than one dispensing event and charged more than one dispensing fee.

119.    Defendants submitted the records or statements to Part D plan sponsors including Fox knowing that those private entities were agents for the federal government, that the Part D plan sponsors would rely upon the truthfulness of these records or statements in submitting Prescription Drug Events (PDE) to CMS, and that in many cases, the federal government would base its payments to Part D plan sponsors on those PDEs.

120.    Defendants' claims were false because dispensing events subsequent to the first one were medically unnecessary and not the most economical means of providing prescription drugs to the beneficiary.

121.    Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the records' or statements' falsity.

122.    The falsity of the records or statements was material to CMS's decision to accept the PDEs both for consideration in determining the compensation to be paid to the Part D plan sponsors and for reimbursement in cases of low-income subsidized beneficiaries and beneficiaries qualifying for catastrophic coverage.

**COUNT V – PRIOR AUTHORIZATION FRAUD**

**FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.**

123.    Plaintiff and Relator repeats each and every allegation of Paragraphs 1 through 33, 73 through 84, and 93 through 96 of this Complaint with the same force and effect as if set forth herein.

124.    As a result of the foregoing conduct, Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

125.    The claims relevant to this Count include all claims for reimbursement of atypical antipsychotic drugs submitted to Part D plan sponsors from 2006 to the present, for which the Part D plan imposed a prior authorization requirement that the Defendants failed to seek, or sought and were denied approval.

126.    Defendants submitted the claims to Part D plan sponsors including Fox knowing that those private entities were agents for the federal government, that the prescription drug claims would be submitted by the Part D plan sponsors as Prescription Drug Events (PDE) to CMS, and that in many cases, the federal government would base its payments to Part D plan sponsors on those PDEs.

127.    Defendants' claims were false because claims for drugs under Medicare Part D are only reimbursable if the conditions imposed by the plan's CMS-approved formulary – including prior authorization – are met, and in these cases they were not.

128.    Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because in each case it received the formulary requirements and either failed to comply with those requirements or ignored the plan's disapproval of the drug's use.

## COUNT VI – PRIOR AUTHORIZATION FRAUD
## FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.

129.    Plaintiff and Relator repeats each and every allegation of Paragraphs 1 through 33, 73 through 84, and 93 through 96of this Complaint with the same force and effect as if set forth herein.

130.    As a result of the foregoing conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

131.     The records or statements relevant to this Count include all records

or statements relating to the dispensing of atypical antipsychotic drugs

submitted to Part D plan sponsors from 2006 to the present, for which the

Part D plan imposed a prior authorization requirement that the

Defendants failed to seek, or sought and were denied approval.

132.     Defendants submitted the records or statements to Part D plan

sponsors including Fox knowing that those private entities were agents for

the federal government, that the Part D plan sponsors would rely upon the

truthfulness of these records or statements in submitting Prescription Drug

Events (PDE) to CMS, and that in many cases, the federal government

would base its payments to Part D plan sponsors on those PDEs.

133.     Defendants' records or statements were false because claims for

drugs under Medicare Part D are only reimbursable if the conditions

imposed by the plan's CMS-approved formulary – including prior

authorization – are met, and in these cases they were not.

134.     Defendants had knowledge (as defined by the False Claims Act, 31

U.S.C. § 3729(b)(1)(A)) of the records' or statements' falsity because in each

case it received the formulary requirements and either failed to comply

with those requirements or ignored the plan's disapproval of the drug's use.

135.     The falsity of the records or statements was material to CMS's decision to accept the PDEs both for consideration in determining the compensation to be paid to the Part D plan sponsors and for reimbursement in cases of low-income subsidized beneficiaries and beneficiaries qualifying for catastrophic coverage.

### COUNT VII – COPAYMENT WAIVER FRAUD
### FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.

136.     Plaintiff and Relator repeats each and every allegation of Paragraphs 1 through 33, 73 through 75, 85 through 92, and 93 through 96of this Complaint with the same force and effect as if set forth herein.

137.     As a result of the foregoing conduct, Defendant knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

138.     The claims relevant to this Count include all claims for reimbursement of drugs submitted to Part D plan sponsors from 2006 to

the present, for which the Part D plan required a copayment that the Defendants failed to seek from the beneficiary or waived in order to induce the beneficiary to purchase or receive the drug.

139.    Defendants submitted the claims to Part D plan sponsors including Fox knowing that those private entities were agents for the federal government, that the prescription drug claims would be submitted by the Part D plan sponsors as Prescription Drug Events (PDE) to CMS, and that in many cases, the federal government would base its payments to Part D plan sponsors on those PDEs.

140.    Defendants' claims were false because claims for drugs under Medicare Part D are only reimbursable if the conditions imposed by the plan's CMS-approved formulary – including copayment – are met, and in these cases they were not.

141.    Defendants' claims were also false because the Defendants' waiver of copayments to induce beneficiaries to purchase or receive prescription drugs violated the Antikickback Statute, 42 U.S.C. §1320a-7b(b).

142.     Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because in each case it received the formulary requirements and either failed to comply with those requirements or ignored the plan's disapproval of the drug's use.

## COUNT VIII – COPAYMENT WAIVER FRAUD

### FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.

143.     Plaintiff and Relator repeats each and every allegation of Paragraphs 1 through 33, 73 through 75, 85 through 92, and 93 through 96of this Complaint with the same force and effect as if set forth herein.

144.     As a result of the foregoing conduct, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

145.     The claims relevant to this Count include all claims for reimbursement of drugs submitted to Part D plan sponsors from 2006 to the present, for which the Part D plan required a copayment that the Defendants failed to seek from the beneficiary or waived in order to induce the beneficiary to purchase or receive the drug.

146.  Defendants submitted the records or statements to Part D plan sponsors including Fox knowing that those private entities were agents for the federal government, that the Part D plan sponsors would rely upon the truthfulness of these records or statements in submitting Prescription Drug Events (PDE) to CMS, and that in many cases, the federal government would base its payments to Part D plan sponsors on those PDEs.

147.  Defendants' claims were false because claims for drugs under Medicare Part D are only reimbursable if the conditions imposed by the plan's CMS-approved formulary – including copayment – are met, and in these cases they were not.

148.  Defendants' claims were also false because the Defendants' waiver of copayments to induce beneficiaries to purchase or receive prescription drugs violated the Antikickback Statute, 42 U.S.C. §1320a-7b(b).

149.  Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because in each case it received the formulary requirements and either failed to comply with those requirements or ignored the plan's disapproval of the drug's use.

150.    The falsity of the records or statements was material to CMS's

decision to accept the PDEs both for consideration in determining the

compensation to be paid to the Part D plan sponsors and for

reimbursement in cases of low-income subsidized beneficiaries and

beneficiaries qualifying for catastrophic coverage.

## JURY TRIAL DEMAND

151.    Plaintiffand Relatordemands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffand Relator prays that the Court enter judgment

against Defendantsas follows:

(a) that the United States be awarded damages in the amount of three times

the damages sustained by the United States because of the false claims

alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C.

§§ 3729 et seq.,provides;

(b) that civil penalties of $11,000 be imposed for each and every false claim

that Defendantscaused to be presented to the United States and/or its

grantees, and for each false record or statement that Defendants made,

used, or caused to be made or used that was material to a false or

fraudulent claim;

(c) that attorneys' fees, costs, and expenses that the Plaintiff and Relator

necessarily incurred in bringing and pressing this case be awarded;

(d) that the Plaintiff and Relator be awarded the maximum amount allowed to

it pursuant to the False Claims Act; and

(e) that this Court award such other and further relief as it deems proper.

Respectfully submitted,

**COCHRAN, CHERRY, GIVENS,
SMITH, SISTRUNK& SAMS, P.C.**

Hezekiah Sistrunk, Jr., Esq.
Georgia Bar No. 649413
Jane LambertiSams
Georgia Bar No. 432025
The Candler Building
127 Peachtree Street, N.E.,
Suite 800
Atlanta, Georgia 30303
Tel. (404) 222-9922
Fax (404) 222-0170
jls@sistrunklaw.com

THE VERNIA LAW FIRM

*Benjamin J. Vernia*

Benjamin J. Vernia
D.C. Bar No. 441287
The Vernia Law Firm
1455 Pennsylvania Ave., N.W.,
Suite 400
Washington, D.C. 20004
Tel. (202) 349-4053
Fax (866) 572-6728
bvernia@vernialaw.com

COUNSEL FOR FOX RX, INC.

Date: 7/26/11

## Certificate of Service

I hereby certify that a copy of the foregoing Second Amended Complaint

filed under seal, pursuant to 31 U.S.C. § 3730 was served on the following:

Hon. Eric Holder
Attorney General
of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Hon. Sally Quillian Yates
United States Attorney
for the Northern District
of Georgia
75 Spring Street, S.W., Suite 600
Atlanta, Georgia 30303-3309

THE VERNIA LAW FIRM

Benjamin J. Vernia
D.C. Bar No. 440287
The Vernia Law Firm
1455 Pennsylvania Ave., N.W.,
Suite 400
Washington, D.C. 20004
Tel. (202) 349-4053
Fax (866) 572-6728
bvernia@vernialaw.com

COUNSEL FOR FOX RX, INC.

Date: 7/26/11